UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRISCOE CORP., AS SOLE GENERAL ) 
PARTNER OF BRISCOE LIMITED )
PARTNERSHIP, )
 )
 Plaintiff )
 )  04 10990
v. ) CIVIL ACTION
 ) NO.
ALPHONSO JACKSON, SECRETARY OF )
U.S. DEPARTMENT OF HOUSING AND )
URBAN DEVELOPMENT, )
 )
 Defendant )
 MAGISTRATE JUDGE Bowler )

## COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

### PARTIES AND JURISDICTION

1. The Plaintiff, Briscoe Corp., is the sole general partner of Briscoe Limited Parntership ("Briscoe"). Briscoe's principal address is 14 Storrs Avenue, Braintree, Massachusetts.

2. The Defendant, Alphonso Jackson, is the duly appointed Secretary of the U.S. Department of Housing and Urban Development ("HUD"), whose principal address is 451 7th Street S.W., Washington, D.C.

3. This is a civil action against an agency of the United States and jurisdiction is proper under 28 U.S.C. § 1346.

## FACTS

4. Briscoe owns an assisted living facility located at 3 Essex Street, Beverly, Massachusetts, known as Landmark at Ocean View, a/k/a Briscoe House.

5. The Briscoe House is operated by Simsbury Associates, 14 Storrs Avenue, Braintree, Massachusetts.

6. HUD insured a private $8,209,700.00 loan to Briscoe from the Charles River Mortgage Company, Inc., which loan was utilized in connection with the construction of the Briscoe House.

7. On or about December 30, 1996, Briscoe and HUD entered into a Regulatory Agreement for Multifamily Housing Projects. A true and accurate copy of the Agreement is annexed hereto.

8. This agreement grants HUD extensive regulatory authority over the operation and maintenance of the property.

9. Sometime in 2002, an issue arose at the Briscoe House property in connection with a structural problem on the north wall of the Briscoe House building. The problem was caused, in part, by shoddy workmanship by a contractor during the rehabilitation of the building in 1997.

10. The wall at issue is an exterior stairwell wall encompassing no more than approximately 5% of the exterior of the building.

11. On June 30, 2003, HUD authorized a release of $25,000.00 from the Reserve for Replacement Account to Briscoe for the repair of the wall.

12. Briscoe engaged a structural engineer, Rene Mugnier, to examine the wall. Mr. Mugnier indicated that the job was far more involve than was previously thought. As

a result, Briscoe did not begin repairing the wall, and proceeded instead with structural investigations to determine the scope of the problem. A structural inspection report was prepared on February 27, 2003.

13. On February 25, 2003, HUD wrote to Briscoe requesting information regarding a plan for the repair of the wall, and an accounting regarding the $25,000.00 advance.

14. On March 4, 2003, Briscoe responded to HUD's request by forwarding to HUD the February 27, 2003 structural inspection report.

15. On March 6, 2003, HUD replied by requesting further details on the repair plans, to which Briscoe replied on March 8, 2003.

16. On March 17, 2003, HUD declared a default under the Regulatory Agreement, citing paragraph 7 of the Agreement, pursuant to which the owner is required "to maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition."

17. The letter also stated that Briscoe had 60 days to "restore the property to HUD standards"; that at the end of the 60-day period, another site visit would be conducted; and that "[i]f any component of the building is found to be structurally unsound, HUD may, without further notice, declare a default, and exercise any of its rights and remedies provided under the Regulatory Agreement, including directing the mortgagee to accelerate the debt and assign the insured mortgage to HUD so that it may commence with foreclosure."

18. Briscoe began work to shore up the wall on March 24, 2003, and provided HUD with an update on April 1, 2003.

19. On April 15, 2003, Briscoe wrote to HUD to inform it that the temporary shoring work was complete.

20. On April 22, 2003, Briscoe wrote to HUD again and attached a preliminary engineer's report indicating that the temporary shoring work was complete, and that plans were underway for completion of the work.

21. At that point, the wall has sufficient support to prevent it from completely collapsing.

22. During the next few months, the contractor which Briscoe hired attempted to complete the repair of the wall.

23. The work was not completed because of a dispute with a neighbor who had blocked the best access to the worksite, and because HUD's inspector, Donald Jordan, took control of the job and stopped the work for several months without informing and consulting with Briscoe.

24. On September 18, 2003, HUD wrote to Briscoe regarding some safety issues which had been observed during a physical inspection of the worksite on September 10, 2003.

25. On September 19, 2003, Briscoe responded by informing HUD that all of the safety issues had been addressed within 72 hours, as HUD had requested in its letter dated September 18, 2003. In addition, Briscoe followed up the letter with documentation which was forwarded to HUD on September 22, 2003.

26. On November 18, 2003, HUD sent a formal notice to Briscoe that it was in default under the Regulatory Agreement because "the physical condition of the project had not improved" since March 17, 2003, and that Briscoe had "placed the safety of the

project's elderly and frail patients at risk, and [had] jeopardized HUD's security interest in the project."

27. On November 27, 2003, Briscoe received a Notice of Acceleration from USBank.

28. Briscoe wrote to HUD on November 21, 2003, and again on December 18, 2003, to rebut the allegations in HUD's November 18th Notice of Default. In particular, Briscoe pointed out that on March 17, 2003, the wall was in danger of collapse, which was no longer the case, and that there was no danger presented to the elderly patients at the Briscoe House.

29. On March 5, 2004, HUD informed Briscoe that the mortgage had been assigned to it and that it would be administering the mortgage.

30. The Briscoe House has a 95% occupancy rate, the tenants pay $3000 per month or more to reside there, and Briscoe's mortgage payments are current.

## COUNT I
### (Declaratory Judgment)

31. The Plaintiff hereby repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 30 above.

32. HUD believes that Briscoe defaulted under the Regulatory Agreement.

33. Briscoe believes that the reasons cited by HUD in the November 18, 2003 declaration of default were erroneous and that no safety problem existed as of that date; that HUD (through its inspector) was at least partially responsible for any delay caused in the final repair of the wall; that the wall in question constitutes only a small portion of the mortgaged property, which is not in disrepair; and that it had not defaulted under the agreement.

34. An actual and substantial case or controversy, within the meaning of 28 U.S.C. § 2201, exists between the parties with respect to their rights under Regulatory Agreement for Multifamily Housing Projects.

35. Briscoe is entitled to a judgment declaring that it had not defaulted under the Regulatory Agreement, and that HUD is not entitled to exercise any right to foreclose on the property.

## COUNT II
### (Injunctive Relief)

36. The Plaintiff hereby repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 35 above.

37. The Plaintiff is currently seeking to obtain financing from other lenders to enable it to purchase HUD's interest in the loan.

38. In the event that HUD exercises a right to foreclose on the property as a result of the Plaintiff's alleged default under the Regulatory Agreement, the Plaintiff will lose the property and will be irreparably harmed.

39. The Plaintiff's mortgage payments are current and HUD will not suffer any harm in the event it is enjoined and restrained from exercising any right to foreclose on the Briscoe House property as a result of the Plaintiff's alleged default under the Regulatory Agreement.

40. The Plaintiff has a meritorious claim for the reasons cited in paragraph 33 of this Complaint.

41. The Plaintiff is entitled to a preliminary injunction restraining and enjoining HUD from exercising any right of foreclosure with respect to the Briscoe House property.

## **PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiff, Briscoe Corp., as sole general partner of Briscoe Limited Parntership, requests this Court to grant it the following relief:

1. Enter an order restraining and enjoining the Defendant from exercising any right to foreclose on the Briscoe House property until further order of this Court.

2. Enter a judgment pursuant to Count I of this Complaint, declaring that the Plaintiff was not in default under the terms and conditions of the Regulatory Agreement for Multifamily Housing Projects between the parties dated December 30, 1996, and that the Defendant is not entitled to exercise any right of foreclosure with respect to the Briscoe House property.

3. Enter a judgment granting the Plaintiff such other and further relief as this Court deems just and reasonable.

THE PLAINTIFF

By its Attorney,

_____
Isaac H. Peres, BBO #545149
50 Congress Street
Boston, MA 02109
(617) 722-0094

# Regulatory Agreement
## Multifamily Housing Projects

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits

Project No. 023-43212

Mortgagee: Charles River Mortgage Company, Inc.

Amount of Mortgage Note: $8,209,700.00

Date 12/30/96

Mortgage: Recorded:     Commonwealth of Massachusetts     County Essex, Southern District     Date
Book     Page

Originally endorsed for insurance under Section 232

This Agreement entered into this 30 of the 30th day of December, 1996, between

Briscoe Limited Partnership

whose address is c/o Simsbury Associates, Inc., 41 Warren Avenue, Boston, MA 02116

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgage property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $3,862.50* per month unless a different date or amount is approved in writing by the Secretary. *Realty    2,736.58
Non-Realty   1,125.92

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the

Mintz, Levin
Financial Center
Boston
02111

loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in Schedule A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232).

4. (a) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control; or;

(ii) Deny the increase stating the reasons therefor.

5. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Through such further provisions agreed to in writing by the parties.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If the mortgage is insured under Section 232:

1. The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.

2. The Owners shall suitably equip the project for nursing home operations.

3. The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.

(i) If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note – declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary – notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

    (a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

    (b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

    (c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

    (d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

    (e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

    (f) "Surplus Cash" means any cash remaining after:

        (1) the payment of:

            (i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

            (ii) All amounts required to be deposited in the reserve fund for replacements;

            (iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

        (2) the segregation of:

            (i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

            (ii) All tenant security deposits held.

    (g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

    (h) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

    (i) "Section" refers to a Section of the National Housing Act, as amended.

    (j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

    (k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provision of this Agreement shall not affect the validity or the remaining portions thereof.

17. The following Owners:

    Briscoe Limited Partnership and any General or Limited Partner thereof.

    do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

    (a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

    (b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

*(To be executed with formalities for recording a deed to real estate)*

REGULATORY AGREEMENT
FHA NO. 023-43212

BK 13910 PG 84

Signed and sealed on the date hereinabove set forth.

BRISCOE LIMITED PARTNERSHIP
By: Briscoe Corp., its Sole General Partner

WITNESS:

By: Clifford F. Boyle, President

SECRETARY OF HOUSING AND URBAN DEVELOPMENT, ACTING BY AND THROUGH THE FEDERAL HOUSING COMMISSIONER

WITNESS:

Duly Authorized

COMMONWEALTH OF MASSACHUSETTS )
                              )
COUNTY OF ESSEX               )

On this 20th day of December, 1996, before me, the undersigned officer, personally appeared Briscoe Limited Partnership, acting by Briscoe Corp., its sole General Partner, acting by Clifford F. Boyle, its President, to me personally known, who, being by me duly sworn, did say that he is the President of Briscoe Corp. and that said instrument was executed in behalf of said partnership acting by said Briscoe Corp., acting by Clifford F. Boyle, President, and said Clifford F. Boyle, acknowledged said instrument to be his free act and deed and the free act and deed of said Briscoe Corp. and the free act and deed of said Briscoe Limited Partnership.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires:

Notary Public
[Notarized Seal]

COMMONWEALTH OF MASSACHUSETTS )
                              )
COUNTY OF ESSEX               )

On this 23rd day of December, 1996 before me, the undersigned officer, personally appeared the United States Secretary of Housing and Urban Development, acting by _____, its duly authorized agent, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that she/he executed the same for the purposes therein contained as her/his free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal

My Commission Expires:

Notary Public
[Notarized Seal] 10/10/98

BK 13910 PG 85

SCHEDULE A

**Legal Description**

Parcel A

The land, together with the buildings thereon, situated at and known as 3 Essex Street, said Beverly, shown as Parcel A on a Plan entitled "Plan of Land Briscoe House Prepared for Sippican Partners Beverly, Massachusetts", dated march 25, 1996, revised April 11 and 17, 1996, recorded in Plan Book 307, Page 41, more particularly bounded and described as follows:

NORTHWESTERLY   by Essex Street, three hundred nine and 77/100ths (309.77) feet;

NORTHEASTERLY   by Parcel B, as shown on said plan, seventy-six and 99/100ths (76.99) feet;

NORTHEASTERLY   by said Parcel B, fifty-five and 82/100ths (55.82) feet;

NORTHEASTERLY   by land now or formerly of Mirta S. Ulivi, as shown on said plan, one hundred nine and 55/100ths (109.55) feet;

NORTHEASTERLY   by land nor or formerly of Kathleen E. Brennan, as shown on said Plan, fifty-three and 80/100ths (53.80) feet;

SOUTHEASTERLY   by land now or formerly of Wallace Trust, land ow or formerly of Robert W. & Patricia A. Watson, and land now or formerly of Susan D. Bonacci & William P. LeBlanc, as shown on said Plan, two hundred eleven and 14/100ths (211.14) feet;

SOUTHEASTERLY   on three courses by land now or formerly of North Shore Heritage Associates, as shown on said Plan, eight and 06/100ths (8.06) feet, forty-eight and 82/100ths (48.82) feet, and twenty-four and 48/100ths (24.48) feet;

SOUTHEASTERLY   by land now or formerly of Angelica A. Rossi, as shown on said Plan, eighty-four and 14/100ths (84.14) feet; and

SOUTHWESTERLY   by Briscoe Street, seventy-five and 30/100ths (75.30) feet.

Said Parcel A contains 58,534 square feet of land, according to said Plan.

BK 13910 PG 86

## Parcel B

The land on the southeasterly side of Essex Street in said Beverly shown as Parcel B on a Plan entitled "*Plan of Land Briscoe House Prepared for Sippican Partners Beverly, Massachusetts*", dated March 25, 1996, revised April 11 and 17, 1996, recorded with the Essex South District Registry of Deeds, Plan Book 307, Plan 41, more particularly bounded and described as follows:

NORTHWESTERLY   by Essex Street, four and 00/100ths (4.00) feet;

NORTHEASTERLY   by Briscoe Street, sixty and 06/100ths (60.06) feet;

EASTERLY        by land now or formerly of Mirta S. Ulivi, as shown on said Plan, sixty-eight and 50/100ths (68.50) feet;

SOUTHERLY       by Parcel A, as shown on said Plan, fifty-five and 82/100ths (55.82) feet; and

WESTERLY        by said Parcel A, seventy-six and 99/100ths (76.99) feet.

Said Parcel B contains 3,721 square feet of land, according to said Plan.

T3/665230.1